UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
UNITED STATES OF AMERICA,                     :
                                              
         - v. -                               :    S3 08 Cr. 1109 (JSR)
JOHN B. OHLE III, and                         :
WILLIAM E. BRADLEY,                           
                                              :
                                              
               Defendants.                    :
                                              
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF THE INCLUSION OF "HOMER" TAX SHELTER LOSSES AS RELEVANT CONDUCT UNDER THE SENTENCING GUIDELINES

                                        PREET BHARARA
                                        United States Attorney for the Southern
                                        District of New York

STANLEY J. OKULA, JR.,
NANETTE L. DAVIS,
Assistant United States Attorneys,

    — Of Counsel —

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
UNITED STATES OF AMERICA,                   :
                                            :
     - v. -                              :   S3 08 Cr. 1109 (JSR)
                                            :
JOHN B. OHLE III, and                       :
WILLIAM E. BRADLEY,                         :
                                            :
                 Defendants.   :
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF THE INCLUSION OF "HOMER" TAX SHELTER LOSSES AS RELEVANT CONDUCT UNDER THE SENTENCING GUIDELINES

The United States respectfully submits this Memorandum of Law in support of its motion seeking to include the tax losses stemming from certain "HOMER" tax shelter transactions as "relevant conduct" under the United States Sentencing Guidelines. For the reasons set forth below, Ohle clearly had knowledge of the fraudulent nature of the HOMER tax shelter losses, and those losses are plainly "relevant conduct" under U.S.S.G. §§ 1B1.3 and 2T1.1. Accordingly, Ohle's Guidelines calculation should account for the fraudulent HOMER tax losses totaling approximately $87,523,600.[1]

---

[1] Government Exhibit 2-43 reflects the losses generated in most of the HOMER transactions (plus the Warner Tillman BART transaction). Those losses (exclusive of the Tillman transaction), a mixture of ordinary and capital losses, total $437,618,000. Using the more conservative 20% taxation figure for capital losses results in a total estimated tax deficiency attributable to the HOMER shelters of $87,523,600. Were the Court to limit the relevant conduct losses to the Gutterman, Clouatre, and Rutland deals, the total shelter losses generated were $33,000,000 for a total estimated tax deficiency of $6,600,000 (again using the conservative 20% figure).

### A. Facts

#### 1. The Counts of Conviction

On June 2, 2010, defendant John B. Ohle III ("Ohle" or "the defendant") was found guilty of all three counts of the third superseding Indictment, which charged him with conspiring to defraud the United States and Bank One (Count One) and tax evasion (Counts Two and Three) for the tax years 2001 and 2002. All three of the Counts of conviction were related to HOMER tax shelter transactions, thirty-six of which were sold by Ohle, other members of Bank One's Innovative Strategies Group ("ISG"), and Jenkens & Gilchrist law firm ("J&G") during the latter part of 2001. In particular, the Count One conspiracy involved Ohle's orchestration of a scheme to fund the implementation of the HOMER tax shelters with funds obtained by fraud and obtain by fraud referral fees relating to certain HOMER transactions, the false income tax reporting of those fees (by Ohle, Ken Brown, and Douglas Steger), and the use of the "1256" tax shelter in 2002 in order to allow Brown and Steger to evade the tax obligations on the HOMER fees they reported. In addition, Ohle utilized his own fraudulent 1256 tax shelter in 2002 to evade taxes due on income he received from Donald Wilson (a HOMER client) as the result of the sale of Ohle's interest in Dumaine Consulting — a firm Ohle and others set up after leaving Bank One and through which they were involved in the sale of two additional HOMER transactions.

#### 2. The HOMER Tax Shelter Proof

Ohle was in charge of the ISG's Chicago office, which was both the location for the germination of the HOMER tax shelter idea (through ISG member Jeff Conrad) and the location from which the marketing and sale of the HOMER tax shelter was administered. HOMER client trial witnesses testified that Ohle took the lead in describing the HOMER transaction to them. David

Ducote, for instance, testified that he met on a number of occasions with Ohle to discuss Ducote's participation in the HOMER transaction. Tr. 1732-34. Similarly, Baton Rouge businessmen Gene Clouatre and James "Pepper" Rutland testified that Ohle, accompanied at the meetings by Scott Deichmann, led the pitch of the HOMER tax shelter. Tr. 295 (Clouatre); 745 (Rutland) (Ohle described "tax elimination" strategy to MMR Group).[2]

The testimony of Bank One personnel in New Orleans also made clear that Ohle was the Bank One point person with respect to HOMER. Indeed, John Kallenborn, a New Orleans-based banker, made that point clear when he sent the following e-mail to then-prospective HOMER client John Koerner, in an effort to arrange a meeting with Koerner in order to allow Ohle to pitch HOMER:

> As a follow-up, John Ohle, our innovative strategies person, will be in New Orleans on Monday, September 24. Could I bring him by to meet you at about 10 a.m.? I know this is a long way out but I would like to hold the date. **John develops and implements tax strategies.** This is similar to what the Big 5 CPA firms do; however, we believe we have a competitive advantage because we can cross-pollinate ideas among our 40,000 middle market clients. This allows us to look at more ideas and bring more tailored ideas to our clients.

GX 43-5 (emphasis added); Tr. 338. Koerner ultimately agreed to meet with Ohle, who described the HOMER tax shelter to Koerner. Tr. 1775-76. Ohle similarly pitched HOMER to Louisiana-based Scott Gutterman. Tr. 171.

---

[2] The precise testimony of Pepper Rutland was as follows:

Q: Who presented the elimination strategy to you?
A: Mr. Ohle did. He got on the blackboard and defined it and diagramed it out basically.
Q: How long did that take, do you recall?
A: Well, it was pretty complicated and it took awhile. It was 30 minutes maybe to draw it up all, maybe longer.

Ohle's lead as the pitch-man for HOMER was not confined, of course, to HOMER clients in the New Orleans area. Chicago businessman Graham Hoggins made clear, through his stipulated trial testimony, the central role played by Ohle:

> In 2001, I sold a part of my company and received income of approximately $6,300,000. I later discussed the sale of the company with my son-in-law David Andrews who worked in the trust department at American National Bank which later became Bank One. David recommended that I meet with John Ohle who was then an employee of Bank One. In the fall of 2001, I attended a meeting with John Ohle who explained various aspects of the transaction I came to know as Homer. At a follow-up meeting, John Ohle explained what was required to participate in this transaction and drew a complex diagram as part of his explanation. John Ohle said not to discuss the transaction details with a lawyer or an accountant because a lot of time went into developing the strategy and it was proprietary. John Ohle also said that there were other investors with large sums of money going into the transaction and said that they were closing the investment opportunity soon. In addition, John Ohle said that he was not sure if he could even get me into the investment and that I had to get the money for the investment immediately. I decided to enter the Homer transaction.

Tr. 1051-52. Chicago-based options trader Donald Wilson also made clear that Ohle was the ISG representative who initially described HOMER to Wilson, and subsequently provided details about the transaction. Tr. 191.

Finally, other members of Bank One's ISG turned to Ohle to discuss the steps of the HOMER transaction, Tr. 88 (Paul Ferguson),[3] and Ohle was the person responsible for arranging a meeting in Chicago to introduce third-party purchaser Ken Brown to Paul Daugerdas. Tr. 535-37.

**B.     Relevant Conduct Principles**

Section 1B1.3(a) of the Guidelines provides that, in determining a defendant's base offense

---

[3] Ferguson also testified that Jeff Conrad "explained to [him] that while he was at KPMG before arriving at Bank One, he had created a strategy which he called BART. My understanding from that conversation with Jeff is that he, with Paul Daugerdas and John Ohle transformed BART into the HOMER transaction." Tr. 65-66.

level, a district court must consider all "relevant conduct," which is defined as: "all acts and omissions committed . . . or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, or in the course of attempting to avoid detection or responsibility for that offense," U.S.S.G. §1B1.3(a)(1); with respect to offenses for which loss amounts or other quantities can be aggregated, "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction," U.S.S.G. §1B1.3(a)(2); and "all harm that resulted from the [defendant's] acts and omissions," U.S.S.G. §1B1.3(a)(3). Section 1B1.3 directs sentencing courts to consider "the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained." U.S.S.G. §1B1.3, cmt. background. Even "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." Id.

The relevant tax guideline, U.S.S.G. § 2T1.1 (incorporated by reference in § 2T1.9 governing a conspiracy to defraud the IRS) contains its own relevant conduct directive, which provides that,

> [i]n determining the total tax loss attributable to the offense (*see* §1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated. The following examples are illustrative of conduct that is part of the same course of conduct or common scheme or plan: (a) there is a continuing pattern of violations of the tax laws by the defendant; (b) the defendant uses a consistent method to evade or camouflage income . . . ; (c) the violations involve the same or a related series of transactions; (d) the violation in each instance involves a false or inflated claim of a similar deduction or credit; and (e) the violation in each instance involves a failure to report or an understatement of a specific source of income, *e.g.*, interest from savings accounts or income from a particular business activity.

U.S.S.G. § 2T1.1, cmt. n.3.

The law is clear that "same course of conduct" does not require a factual connection between the offense conduct and the other criminal acts, in the form of an overall criminal scheme. Instead,

that Guideline term contemplates that there be sufficient similarity and temporal proximity "to reasonably suggest that repeated instances of criminal behavior constitute a pattern of criminal conduct." United States v. Roederer, 11 F.3d 973, 979 (10th Cir. 1993). As the Second Circuit explained in United States v. Perdomo, 927 F.2d 111 (2d Cir.1991), "[t]he 'same course of conduct' concept . . . looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be 'connected together' by common participants or by an overall scheme. It focuses instead on whether defendant has engaged in an identifiable 'behavior pattern,' . . . of specified criminal activity." Id. at 115 (citing, among other authorities, Wilkins & Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines,* 41 S.C.L.Rev. 495, 515-16 (1990)). See also United States v. Thomas, 54 F.3d 73, 84 (2d Cir. 1995) ("Acts may be found to be part of the 'same course of conduct' if the defendant engaged in a repeated pattern of similar criminal acts, even if they were not performed pursuant to a single scheme or plan." ).

In the tax fraud context, the Second Circuit and other Circuits have routinely held that the total tax loss under U.S.S.G. § 2T1.1 should include the corresponding state and city tax losses as "relevant conduct." See United States v. Fitzgerald, 232 F.3d 315, 318 (2000) (affirming the district court's inclusion of corresponding state and city tax evasion as part of the total tax loss); see also United States v. Maken, 510 F.3d 654, 657-58 (6th Cir. 2007) (tax loss includes federal and state losses); United States v. Baucom, 486 F.3d 822, 829 (4th Cir. 2007) (holding that failure to file state tax returns was part of the same course of conduct for which defendants were convicted); United States v. Powell, 124 F.3d 655, 656-66 (5th Cir. 1997) (state tax evasion constituted a "common scheme or plan" and the "temporal proximity, similarity, and regularity" of the federal and state offenses further indicated that the state tax offenses constituted "relevant conduct").

C.   **Discussion**

1.   **The HOMER Tax Shelter Fraud Is "Relevant Conduct"**

Based on the foregoing principles, there can be little question that the HOMER tax shelter losses constitute "relevant conduct," if not actual offense conduct. First, successful sale of the HOMER tax shelters and thus generation of the HOMER losses was the goal of John Ohle in recruiting Ken Brown to participate in the HOMER tax shelters — without which Ohle would have received none of the profits that he and Brown agreed to split. Second, losses from the HOMER transactions occurred at the very same time that Ohle and his co-conspirators were carrying out the factually-related, Count One tax fraud scheme with respect to the HOMER referral fees. Thus, there is a precise temporal overlap in the offense conduct and the relevant conduct. Moreover, the type of tax fraud involved in HOMER — devising, marketing, and implementing a complex tax shelter transaction designed to produce fraudulent, non-economic losses for individual taxpayers — is the precise type of conduct carried out by Ohle with respect to the "1256" tax shelter transaction that was part of the offense conduct. Indeed, just as he sold the phony HOMER tax shelter to Clouatre, Rutland, Gutterman, Koerner, and others, Ohle — though the use of his accounting and tax skills — convinced Steger and Ken Brown to participate in the 1256 transaction, and also claimed $4,000,000 in fraudulent losses himself. Thus, the relevant conduct plainly constituted "a consistent method to evade or camouflage income," or, more generically, a continuing violation of the tax laws by the defendant, both within the meaning of the 2T1.1 commentary.

2.   **Ohle Was a Knowing and Willful Participant in the HOMER Fraud**

a.   **Ohle's Insertion of Puppet Ken Brown as Third-Party Purchaser**

As an initial matter, all of the losses from the HOMER tax shelters should be deemed

fraudulent based on the presence and activities of Ken Brown in those transactions. The testimony of Brown made clear that, far from being a legitimate, unrelated third-party businessman in each and every HOMER transaction, Brown was simply a puppet whose activities were funded by Ohle and controlled by Ohle and others (at J&G). Courts have found criminal liability appropriate when parties to a tax-motivated transaction employ a tax exempt entity that is utilized as a sham conduit to absorb, or simply fail to pay, the tax obligation that would otherwise be due from the transaction. See United States v. Veksler, 62 F.3d 544 (3d Cir. 1995) (upholding tax fraud conspiracy conviction where defendants used tax-exempt companies that were controlled by conspirators and set up merely as conduits to be left with tax obligation); United States v. Macchia, 35 F.3d 662 (2d Cir. 1994) (same); United States v. Aracria, 968 F.2d 1512 (2d Cir. 1992) (same); see also United States v. Heller, 866 F.2d 1366 (11th Cir. 1989) (use of sham loan through foreign entities set up and controlled by defendant, resulting in false deductions, proper basis for criminal liability). Moreover, courts have upheld the invalidity of losses stemming from tax shelter transactions that attempted to employ, in effect, puppets. Fidelity Intern. Currency Advisor A Fund, LLC v. United States, ___ F. Supp.2d ___, 2010 WL 1976822, at *174 (D. Mass. May 17, 2010). In refusing to recognize losses based on the use of individuals who were not bona fide, arms-length participants, the Fidelity court wrote, in words equally applicable here:

> The [taxpayers] contend that as long as the transactions were not fictitious — that is, as long as the entitles existed, the money was transferred, and the options were purchased and sold — the economic substance doctrine does not apply. But the transactions at issue were "real" only in the sense that a performance by actors on stage is "real." The actors are real human beings, and the stage sets are made of real wood and real paint. But the actors are reading from a script. No one watching "Macbeth" believes that they are witnessing the murder of a Scottish king, and the actors do not believe it either. Here, too, the participants were simply following a script — a script that had little or no connection to any underlying business or economic reality.

### b. Ohle's Knew the HOMER Losses Were Fraudulent

The proof adduced at trial and at the Fatico hearing support the inference that Ohle was aware of the fraudulent and contrived nature of the HOMER losses. Ohle dealt directly with Clouatre, Rutland and several other HOMER taxpayers whose interest in the tax shelter was transparent — they wanted to participate in HOMER purely to obtain the tax losses. It is simply inconceivable that Ohle, the Bank One ISG member who spearheaded the HOMER sales, liaised with Daugerdas regarding aspects of the transaction, and was involved in the design of the options in the 1256 transaction, was unaware of the lack of economic substance and business purpose in the HOMER tax shelter in the form of a lack of reasonable opportunity (or outright inability) to produce a profit and the lack of any non-tax business purpose. Stated simply, Ohle's role and contemporaneous tax fraud activities support the inference that he either knew or willfully closed his eyes to the criminal infirmities of the HOMER tax shelter.

### CONCLUSION

For the foregoing reasons, Government's application should be granted in its entirety.

Dated: New York, New York
September 22, 2010

>Respectfully submitted,
>
>PREET BHARARA
>United States Attorney
>Southern District of New York
>
>By:    s/Stanley J. Okula, Jr.
>STANLEY J. OKULA, JR.
>NANETTE L. DAVIS
>Assistant United States Attorneys
>(212) 637-1585/(212) 637-1117
>stan.okula@usdoj.gov
>nanette.l.davis@usdoj.gov

## **CERTIFICATE OF SERVICE**

       I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non registered participants on the above date.

       By:    s/Stanley J. Okula, Jr.
               STANLEY J. OKULA, JR.
               Assistant United States Attorney
               (212) 637-1585
               stan.okula@usdoj.gov