UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA :

- against - : S3 08 Cr. 1109 (JSR)

JOHN B. OHLE III and. :
WILLIAM E. BRADLEY,
:
               Defendants.
:
------------------------------------------------------------x

## DEFENDANT JOHN B. OHLE III'S POST-HEARING
## REPLY SUBMISSION REGARDING THE HOMER TRANSACTION

Defendant John B. Ohle III ("Ohle") respectfully submits this Post-Hearing Reply submission regarding the HOMER transaction, in response to the government's submission ("G.Sub"). The purpose of the post-hearing submissions was to provide the Court with the equivalent of an oral summation addressed to the factual issue of whether or not the government proved that Ohle had criminal responsibility for the HOMER transaction making it "relevant conduct" for his sentencing.. However, the government's submission is almost entirely in the form of a legal memorandum, barely even addressing the facts presented at either the trial or the hearing. The government effectively assumes that it has proven Ohle's culpability with respect to HOMER.

As set forth in our initial submission, the key question is whether the government proved that Ohle knew and believed that the HOMER transaction violated the tax law. *Cheek v. United States,* 498 U.S. 192, 199 (1991). For the reasons set forth in our initial submission, the government did not prove this.

· The only argument that the government presents with respect to Ohle's alleged

1

culpability for HOMER relates to the role of Kenneth Brown ("Brown") in the transactions. As explained by IRS attorney David Kirk, Brown purchased the remainder interests in the trusts involved in the HOMER transactions which in principle would result in certain tax benefits passing through to the taxpayers who invested in HOMER (9/13/10 Tr. 98-100). The government asserts that Brown was not a "legitimate unrelated third-party" but merely a "puppet" (G.Sub. 9).

The government ignores the fact that "related parties" is a defined term under the Internal Revenue Code. 26 U.S.C. §267 disallows deductions resulting from sales or exchanges of property between "related taxpayers" and Section 267(b) lists the relationships that will result in such a disallowance. Brown does not fall into any of the categories of "related taxpayers" set forth in Section 267(b). As emphasized in our initial submission, the question is whether Brown was "related" to any of the HOMER investors under Section 267(b), not whether Brown was "related" to Ohle.

There is a good reason for the Internal Revenue Code's treatment of "related taxpayers". If a sale or exchange takes place between taxpayers who are defined as "related" under Section 267(b) by reason of family relationships or common ownership, the sale or exchange was likely not a real economic event in which money or property actually changed hands between the taxpayers. *McWilliams v. Commissioner*, 331 U.S. 694, 701 (1947). That is not what occurred in the HOMER transactions. Brown actually purchased the remainder interests and the HOMER taxpayers did not fund Brown's purchases. More significantly, Brown received real economic profits as a result of having purchased the trust remainder interests – profits to Brown amounting to over $1 million – and Brown did not share any of those profits with the HOMER taxpayers.

Brown and the HOMER taxpayers were not "related taxpayers" under Section 267 of the Code and his role in HOMER did not render the transaction in violation of the tax law.

The government cites a number of irrelevant cases for the proposition that Brown was not a "real" participant in the HOMER transactions[1]. This argument has nothing to do with the issue of whether Brown was a "related party" under the tax law. Brown paid "real" money to acquire the remainder interests and he did not obtain that money from the taxpayers, and he received "real" profits from the investment which he did not share with the taxpayers.

The government makes much of the fact that Ohle arranged Brown's funding and shared in Brown's profits. Again, if the HOMER *taxpayers* had arranged Brown's funding and had shared in his profits, that could have placed Brown within the definition of a "related party" under Section 267(b) and would have disallowed any deductions resulting from HOMER. However, neither Section 267 nor any other provision of the tax laws made Brown into a "related party" merely because of his involvement with Ohle.

Ohle stands convicted of certain fraud and tax offenses on which he will be sentenced which in part stem from his involvement with Brown, namely, the alleged use of money obtained from commissions on the Carpe Diem investments to fund Brown and Ohle's alleged sharing of Brown's profits without reporting them on his tax returns. There is no basis for any further enhancement of Ohle's sentence based on the government's incorrect assertion that Brown's role in HOMER in itself rendered the

---

[1] All but one of the cases cited by the government involved "daisy chain" schemes commonly used to evade motor fuel excise taxes, having nothing whatsoever to do with this case. *Fidelity Intern. Currency v. United States*, 2010 WL 1976822 (D. Mass. 2010) involved the separate issue of "economic substance" under the tax law, which we address below, and not any related party issue.

transaction in violation of the tax law, and there is no basis for concluding that Ohle knew and believed that Brown's role in the transaction – which was well known to J&G – rendered HOMER in violation of the tax law.

· The government devotes one sentence at the end of its submission in arguing that the evidence proved that Ohle knew that HOMER lacked economic substance (G.Sub. 10), but the government's submission contains more rhetoric than analysis of the tax law. As set forth in our initial submission, "economic substance" is a two-prong test based on both the taxpayer's subjective motivation for entering the transaction and the objective potential for making an economic profit on the transaction. The government cites no evidence that Ohle knew that HOMER lacked profit potential (assuming that it did lack profit potential). Ohle knew that HOMER was primarily designed by J&G, a prominent law firm, and that the option trades were designed by Deutsche Bank, a prominent investment bank. Other than that, there was no evidence that Ohle knew anything about the options trades. Why would Ohle have assumed that the option trades were designed in such a way that they did *not* have profit potential? On the contrary, the logical assumption would have been that J&G and Deutsche Bank would have designed the options trades in such a way that they *did* have profit potential, if no other reason than to bolster the argument that HOMER passed muster under the "economic substance" doctrine and therefore gave rise to valid tax deductions.

On this point, it is helpful to dispel a common misconception that there is a contradiction between obtaining a tax loss on a transaction such as HOMER, and earning an economic profit on the transaction. As explained by IRS attorney Kirk, the tax benefits from HOMER flowed from the rules in IRC §671 governing grantor trusts which

would result in the taxpayer's receiving a non-economic taxable loss from the transaction through an increase in the basis of the trust's assets (9/13/10 Tr. 97-98). The potential for an economic profit in HOMER resulted from the "spread" between the paired options that were part of the transaction. There was no reason why the HOMER transaction could not have resulted in both a non-economic loss for tax purposes as well as an economic profit on the options trades. Even Dr. DeRosa acknowledged that there was a 12% probability of making a profit on the certain of the options trades (without consideration of J&G's fees and certain other costs) (9/13/10 Tr. 78-82) . There was no reason why Ohle would not have believed that HOMER had real profit potential.

There is no dispute that Ohle sold the HOMER transaction. But the evidence also showed that Ohle believed that it was fully approved within Bank One, was supported by a legal opinion from a prominent law firm, and that he neither knew nor had reason to know that he was violating the tax laws by selling HOMER.

· Finally, the Court should reject the government's argument that Ohle's involvement with the HOMER transactions constitutes "relevant conduct" for purposes of this sentencing, even if Ohle's involvement with HOMER had been shown to involve criminal culpability. Indeed, Judge Sand's pretrial decision severing the HOMER charges from the "referral fee" charges makes it clear that these activities did not involve a common scheme or plan or the same course of conduct. *United States v. Ohle*, 678 F.Supp.2d 215, 224-227 (S.D.N.Y. 2010). As such, Ohle's involvement with HOMER, even if it were criminal in nature, does not constitute "relevant conduct" for purposes of determining Ohle's guideline range.

## **CONCLUSION**

The government's contention that the HOMER tax conspiracy should be included within the definition of Ohle's "relevant conduct" for sentencing purposes should be rejected. Alternatively, the Court should defer ruling on the government's application until after the government has produced previously undisclosed documents produced by J&G and after the defense has had a reasonable opportunity to review them.

Dated: September 24, 2010
      New York, NY

                                  FRANKEL & ABRAMS

By: _____
        Stuart E. Abrams (SA-6957)
        Attorneys for Defendant John B. Ohle III
        230 Park Avenue, Suite 660
        New York, NY 10169
        (212) 661-5000
        (212) 661-5007 (fax)
        sabrams@frankelabrams.com