UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
UNITED STATES OF AMERICA,             :
                                      :
            -v-                       :    S3 08 CR 1109 (JSR)
                                      :
JOHN B. OHLE III, and                 :    FINDINGS AND CONCLUSIONS
WILLIAM E. BRADLEY,                   :    REGARDING "RELEVANT
                                      :         CONDUCT"
            Defendants.               :
------------------------------------- x



JED S. RAKOFF, U.S.D.J.

     On August 11, 2009, the Government filed an eight-count Second Superseding Indictment against defendants John B. Ohle III and William E. Bradley. The Honorable Leonard B. Sand, to whom the case was then assigned, severed three counts of the Second Superseding Indictment, see Memorandum & Order 01/12/10, and the Government proceeded to trial on the severed counts, now recast as the Third Superseding Indictment. On June 2, 2010, the jury found Ohle guilty of all three Counts of the Third Superseding Indictment, which charged him with conspiring to defraud the United States and Bank One (Count One) and tax evasion for the tax years 2001 and 2002 (Counts Two and Three, respectively), all in connection with the promotion of a tax shelter called "HOMER." (Bradley was likewise convicted of Count One.) Following Ohle's conviction, the Government declined to try him on the remaining counts of the Second Superseding Indictment, but argued instead that Ohle's conduct underlying the severed charges constituted "relevant conduct" for purposes of calculating Ohle's

Sentencing Guidelines range, because the evidence showed that the HOMER tax shelter was itself fraudulent, that Ohle knew it, and that he willfully participated in its implementation.

Ohle disputed these allegations, and, accordingly, the Court conducted a two-day evidentiary hearing. In addition to incorporating by reference the evidence previously presented at the trial, the Government presented the testimony of two HOMER clients, Gene Clouarte and Scott Gutterman, the testimony of an expert witness, David DeRosa, and the testimony of an IRS attorney, John Kramer.[1]

On the basis of this evidence, it is obvious that the HOMER tax shelter was fraudulent. Its complex design was simply intended to disguise the fact that its profit potential was infinitesimal, see 09/13/2010 Tr. at 67-76, and its sole purpose, as even its clients understood, was to generate tax benefits. Ohle argues, however, that the evidence was insufficient to prove he knew the transaction violated the tax laws. See Cheek v. United States, 498 U.S. 192, 199 (1991). Although there is no dispute he actively promoted the sale of the HOMER tax shelter, the Government has not shown, he contends, that he had anything to do with the creation or design of the shelter, or the implementation of its transactions, let alone that he

---

[1] Defense counsel for Ohle presented the testimony of Ohle's former business partner, Scott Deichmann.

knew it had no genuine profit potential. See Defendant John B. Ohle III's Post-Hearing Submission Regarding the HOMER Transaction ("Def. Mem.") at 4, 5-7. He further notes that the sale of the transaction was approved at the highest levels of Bank One's management, and that the legality of the transaction was supported by opinion letters from the law firm of Jenkens & Gilchrist. See id. at 3-4.

By a preponderance of the credible evidence, however, the Court concludes Ohle knew the HOMER tax shelter was fraudulent and violated the tax laws and, knowing this, willfully promoted the sale of the shelter. Ohle was himself an attorney and CPA. He was head of the Chicago office of Bank One's "Innovative Strategies Group" (which was engaged in tax shelter promotion), and he took the lead in promoting the sale of HOMER. See, e.g., 09/17/2010 Tr. at 179; 09/13/2010 Tr. at 29, 43; Trial Tr. at 81, 295, 745, 1732-34, 1775-76. This, the Court infers, required him to be familiar with HOMER's structure and be in a position to explain how it worked. Yet all that clients were able to understand from his presentations was that the product generated tax losses.

Moreover, and tellingly, Ohle funded, utilized, and controlled a confederate, Ken Brown, to pose as the requisite "unrelated third-party" in each HOMER transaction. See, e.g., Trial Tr. at 530-35. This itself rendered the HOMER tax shelter fraudulent as to those transactions, see, e.g., Spies v. United States, 317 U.S. 492, 499 (1943); United States v. Josephberg, 562 F.3d 478 (2d Cir.

3

2009); United States v. Macchia, 35 F.3d 662 (2d Cir. 1994); Fidelity Intern. Currency Advisor A Fund, LLC v. United States, 2010 WL 1976822, at *5 (D. Mass. May 17, 2010). It also speaks volumes about Ohle's knowledge of, and complicity, in the overall fraudulent nature of HOMER.

While Ohle advances other arguments not here discussed, the Court has considered them and finds they do not alter the Court's conclusion that it is more likely than not that Ohle knowingly and willfully violated the tax laws by selling interests in a tax shelter, HOMER, that he not only knew was fraudulent and violative of the tax laws but also helped make it so.

This, moreover, is "relevant conduct" under Sections 1B1.3 and 2T1.1 of the Sentencing Guidelines as applied to Ohle's overall sentencing in this case. Section 1B1.3(a) of the Guidelines provides that, in determining a defendant's base offense level, the court must consider all "relevant conduct," which is defined as "all acts and omissions committed . . . or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," U.S.S.G. § 1B1.3(a)(1). With respect to offenses for which loss amounts or other quantities can be aggregated, relevant conduct constitutes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction," U.S.S.G. §

4

1B1.3(a)(2), and "all harm that resulted from the [defendant's] acts and omissions," U.S.S.G. § 1B1.3(a)(3).[2] The relevant tax guideline, U.S.S.G. § 2T1.1, contains its own relevant conduct directive, which provides that "[i]n determining the total tax loss attributable to the offense, all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1, cmt. n.2.[3]

It is clear that the HOMER tax shelter fraud described above was part of the preparation for the offenses for which Ohle was convicted at trial and were part of the same course of conduct.

---

[2] "Acts may be found to be part of the 'same course of conduct' if the defendant engaged in a repeated pattern of similar criminal acts, even if they were not performed pursuant to a single scheme or plan." United States v. Thomas, 54 F.3d 73, 84 (2d Cir. 1995) (citation omitted). See also United States v. Perdomo, 927 F.2d 111, 115 (2d Cir. 1991) ("The 'same course of conduct' concept thus looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be 'connected together' by common participants or by an overall scheme. It focuses instead on whether defendant has engaged in an identifiable 'behavior pattern,' . . . of specified criminal activity.") (internal citation omitted).

[3] The tax guideline notes that "[t]he following examples are illustrative of conduct that is part of the same course of conduct or common scheme or plan: (a) there is a continuing pattern of violations of the tax laws by the defendant; (b) the defendant uses a consistent method to evade or camouflage income . . . ; (c) the violations involve the same or a related series of transactions; (d) the violation in each instance involves a false or inflated claim of a similar deduction or credit; and (e) the violation in each instance involves a failure to report or an understatement of a specific source of income . . . ." U.S.S.G. § 2T1.1, cmt. n.2.

5

U.S.S.G. § 1B1.3(a); U.S.S.G. § 2T1.1, cmt. n.2. All three counts of conviction were related to the HOMER tax shelter transaction. Ohle would have received none of the profits that he and Ken Brown agreed to split without the generation of the HOMER tax losses. Additionally, losses from the HOMER transaction occurred at the same time Ohle and his co-conspirators carried out the factually-related Count One HOMER referral fee scheme; thus, there is a temporal overlap in the offense conduct and the relevant conduct. Moreover, the type of tax fraud involved in the HOMER fraud is the precise type of conduct underlying the "1256" tax shelter transactions that formed part of the offense conduct. Thus, as the Government argues in its Memorandum of Law, this conduct constituted a "consistent method to evade or camouflage income" within the meaning of the Section 2T1.1 commentary. See Gov't Mem. at 8.

In the last paragraph of his Reply, Ohle argues that "Judge Sand's pretrial decision severing the HOMER charges from the 'referral fee' charges makes it clear that these activities did not involve a common scheme or plan or the same course of conduct." Defendant John B. Ohle III's Post-Hearing Reply Submission Regarding the HOMER Transaction ("Def. Reply") at 5 (citing United States v. Ohle, 678 F. Supp. 2d 215, 224-227 (S.D.N.Y. 2010)). However, the factors a court must take into account in the discretionary decision to sever, such as potential jury confusion from the overlap, see, e.g., Herring v. Meachum, 11 F.3d 374, 377-78 (2d Cir. 1993); United

States v. Ruiz, 894 F.2d 501, 505 (2d Cir. 1990); United States v. Mahaffy, 466 F. Supp. 2d 115, 120-22 (E.D.N.Y. 2006), are materially different from the factors a court must consider in deciding whether related conduct must be considered "relevant conduct" under the sentencing guidelines.

Thus, the Court determines that the HOMER tax shelter fraud and the attendant tax losses constitute "relevant conduct" that the Court will consider at sentencing.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
October 25, 2010